# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 11** |
| | § | |
| **ROOSTER ENERGY, L.L.C.,**[1] ***et al.*** | § | **Case No. 17-50705** |
| | § | |
| **Debtors.** | § | **(Joint Administration Requested)** |
| | § | **(Emergency Hearing Requested)** |

### DECLARATION OF KENNETH F. TAMPLAIN, JR., CHIEF EXECUTIVE OFFICER AND PRESIDENT OF ROOSTER ENERGY LTD., IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

Pursuant to 28 U.S.C. § 1746, I, Kenneth F. Tamplain, Jr., declare as follows under penalty of perjury:

1.  I am the Chief Executive Officer ("<u>CEO</u>") of Rooster Energy Ltd. ("<u>Rooster Canada</u>"), a corporation organized under the laws of British Columbia, Canada, one of the debtors herein and the ultimate parent corporation of the other debtors and debtors in possession (collectively, the "<u>Debtors</u>") in the above-captioned Chapter 11 Cases. I am also the CEO of each of the other Debtors. I am authorized to submit this declaration (the "<u>First Day Declaration</u>") on behalf of the Debtors.

2.  As the CEO of Rooster Canada, I am responsible for formulating and supporting tactical initiatives and financial strategies, directing the implementation of strategic business plans, arranging for debt and equity financing, managing the accounting, financial reporting, investor relations, tax and treasury functions, the information technology group and engaging in human resource and legal issues. Prior to becoming CEO of Rooster Canada, I was the Vice President - Land & Legal and General Counsel of Rooster Canada. As a result

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Rooster Energy, L.L.C. (7323); Rooster Petroleum, LLC (8665); Rooster Oil & Gas, LLC (8968); Probe Resources US Ltd. (0456); Cochon Properties, LLC (1694); and Morrison Well Services, LLC (9531).

1

of my tenure with Rooster Canada, I am familiar with the Debtors' business, financial condition, policies and procedures, day-to-day operations, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees or retained advisors who report to me in the ordinary course of business. I am authorized by each of the Debtors to submit this First Day Declaration. References to the Bankruptcy Code (as defined below), the chapter 11 process, and related legal matters, are based on my understanding of such matters in reliance on the explanation, and the advice, of counsel. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3.　　　On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief in the United States Bankruptcy Court for the Western District of Louisiana (the "Court"). The Debtors will continue to operate their businesses and manage their properties as debtors in possession. I submit this First Day Declaration on behalf of the Debtors in support of the Debtors' (a) voluntary petitions for relief that were filed under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and (b) "first-day" pleadings, which are being filed concurrently herewith (collectively, the "First Day Motions"). The Debtors seek the relief set forth in the First Day Motions to minimize the adverse effects of the commencement of the Chapter 11 Cases on their businesses and to maximize the value of the Debtors' estates.

4.　　　The First Day Motions encompass the following:

- Debtors' Emergency Motion for entry of an order directing joint administration of their Chapter 11 Cases (the "Joint Administration Motion");

- Debtors' Emergency Motion for an order extending the time within which the debtors must file their bankruptcy schedules and statements (the "Schedules Extension Motion");

2

- Debtors' Emergency Motion under Section 105(a) and Rules 2002 and 9007 to establish notice procedures and to limit notice for certain proceedings (the "Notice Procedures Motion");

- Debtors' Emergency Motion for entry of an order authorizing the Debtors to (i) maintain and use existing bank accounts, cash management system, and business forms, (ii) honor certain prepetition obligations related thereto, and (iii) continue to perform certain intercompany transactions (the "Cash Management Motion");

- Debtors' Emergency Motion for entry of interim and final orders (i) authorizing post-petition use of cash collateral, (ii) granting adequate protection to prepetition secured parties, (iii) modifying the automatic stay, (iv) scheduling a final hearing, and (v) granting related relief (the "Cash Collateral Motion");

- Debtors' Emergency Motion for authority to pay prepetition wages, salaries, vacation pay, reimbursable employee expenses, and employee benefit contributions (the "Prepetition Wage and Benefit Motion");

- Debtors' Emergency Motion for entry of an order authorizing payment of compensation commensurate with pre-petition payments to specified officers (the "Insider Compensation Motion")

- Debtors' Emergency Motion for entry of an order authorizing the Debtors to pay certain prepetition taxes and to make payments under insurance premium finance agreements (the "Tax and Insurance Motion");

- Debtors' Emergency Motion for entry of interim and final orders (i) restraining utility companies from discontinuing, altering, or refusing service; (ii) deeming Utility Companies adequately assured of payment for future utility services, pending entry of a final order; (iii) establishing procedures for determining requests for additional assurance (the "Utilities Motion");

- Debtors' Emergency Motion for entry of interim and final orders authorizing the Debtors to pay, in the ordinary course of business, (i) royalty payments, (ii) working interest disbursements, and (iii) certain other lease obligations (the "Royalties Motion");

- Debtors' Emergency Motion for interim and final orders authorizing, but not directing, the Debtors, in the ordinary course of their businesses, (i) to pay prepetition amounts due, and (ii) to perform post-petition obligations under a certain prepetition hedging agreement (the "Hedging Motion"); and

- Debtors' Emergency Motion for interim and final order pursuant to 11 U.S.C. §§ 105, 364, Fed. R. Bankr. P. Rule 4001(c) and L.R. 4001(b) and (c): (i) authorizing debtors to obtain post-petition financing; (ii) granting related relief;

3

and (iii) scheduling final hearing (the "<u>DIP Financing Motion</u>").

5.      Part I of this First Day Declaration provides an overview of the oil and gas industry and recent developments therein, offers detailed information about the Debtors' businesses, operations, organizational structure, capital structure, and significant prepetition indebtedness, as well as a discussion of the Debtors' financial performance and the events leading to the Debtors' chapter 11 filings.[2] Part II sets forth the relevant facts in support of the First Day Motions, as well as certain other motions and applications, such as applications to employ professional persons, that will be submitted in the coming days.

## PART I

### I.      OIL AND GAS INDUSTRY BACKGROUND AND RECENT HISTORY

6.      The Debtors are an integrated oil and gas exploration and production company and leading downhole well intervention and decommissioning service provider.  The Debtors' oil and gas properties are located in the outer continental shelf of the Gulf of Mexico ("<u>GOM</u>") and are leased from the United States of America and regulated by the U.S. Department of Interior ("<u>Interior</u>").

7.      The challenges associated with offshore exploration and production include, among other things, (i) developing technologies that support the identification of hydrocarbon reservoirs and the design, construction, installation, operation and decommissioning of equipment and infrastructure needed to support drilling, production and transportation activities in increasingly significant water depths, and (ii) the ability to recruit, develop and retain highly skilled professional and field employees to safely manage a vast array of

---

[2] Many of the financial figures presented in this declaration are unaudited and potentially subject to change, but reflect the Debtors' most recent review of their business. The Debtors reserve all rights to revise and supplement the figures presented herein.

4847-5923-1295 v9

2909093-000015 06/02/2017

technically sophisticated activities occurring in environmentally sensitive areas.

8.     Historically, the majority of drilling activities in the GOM occurred on the outer continental shelf ("OCS"), which generally extends from 3 to 200 nautical miles (230.2 miles) from the U.S. coast.  All activities conducted on the OCS are within federal jurisdiction. Given the longevity and sophistication of offshore oil and gas operations, the GOM is home to a vast array of infrastructure, support equipment and people who are all working to meet the nation's growing energy demands.

9.     The process of offshore exploration and production begins with evaluation of three-dimensional seismic data of potential hydrocarbon-rich pockets ("prospects") in which to drill.  Once a prospect is identified, a company will design and drill an exploration well, which is then analyzed to determine whether commercially viable quantities of hydrocarbons are present in the area.

10.     If a well contains a commercial volume of hydrocarbons, the well is completed and tied back to a production platform, which must be constructed unless an existing platform is located in the area. Production is transported from the well to the production platform through a series of underwater pipelines. Production platforms house a variety of production equipment designed to capture and separate the flow stream. While in a formation, hydrocarbons are under pressure, and production activities occur on a 24/7/365 basis, so highly trained field personnel must be employed to monitor changes in flow rate and well pressure in order to detect anomalies in well activities and prevent potential uncontrolled flows of hydrocarbons.

11.     The average life of production from a GOM shelf well is approximately 5 years. Once the wells associated with a production platform stop producing commercial

5

quantities of hydrocarbons, and no prospects for future drilling activity are identified the platform and all associated equipment must be decommissioned according to applicable governmental regulations. The decommissioning process includes (i) plugging and abandoning all wells, (ii) removing, reefing or abandoning in place, the platform, production equipment and all associated pipelines, and (iii) scanning the surrounding seafloor to recover any ancillary debris to return the area to pre- drilling conditions. The Debtors' well service division, Morrison Well Services, LLC, both provides these services for the production division, but also, and more importantly, contracts with other production companies to decommission their non-producing wells and platforms.

12. The recent exploitation of shale formations caused a significant increase in oil and gas production in the United States. The increased production from the United States, coupled with a decision by the Organization of Petroleum Exporting Countries ("OPEC") not to reduce production quotas to stabilize oil prices, eventually led to an oversupply of oil in the global markets. After reaching more than $105 per barrel as recently as June 2014, oil prices dropped to below $54 per barrel at the end of 2014 and closed below $30 per barrel in February 2016.[3] On April 28, 2017, the price of oil closed at approximately $51.73 per barrel. Like oil prices, gas prices also fell as a result of increased gas production from shale formations. Average U.S. daily gas production reached a record high of 79 billion cubic feet in 2015 with gas prices dropping from a high of over $15 per thousand cubic feet ("Mcf") in December 2005 to less than $2 per Mcf in December 2015. On April 28, 2017, the price of gas

---

[3] "Oil prices" in this paragraph refers to the price of a barrel of oil, as measured by reference to the price of a prompt month futures contract referencing West Texas Intermediate crude oil, delivery to Cushing, Oklahoma, traded on the New York Mercantile Exchange.

4847-5923-1295 v9

2909093-000015 06/02/2017

closed at approximately $3.28 per Mcf.[4] Oil and natural gas prices remain volatile, and future prices are difficult to forecast.

13.     As a result of sustained, low oil and natural gas commodity prices, the oil and gas industry in general is in severe crisis. Independent oil and gas producers have been significantly affected, with over 100 companies filing for bankruptcy in 2015 and 2016.

## II.     BUSINESS OF THE DEBTORS

### A.     Overview

14.     Rooster Canada was incorporated in British Columbia in 1988. On April 30, 2012, Rooster Canada completed the acquisition of all of the membership interests in Rooster Energy L.L.C. ("Rooster Energy"), a Louisiana limited liability company.  The transaction was treated as a reverse acquisition of Rooster Canada by Rooster Energy. On November 17, 2014, Rooster Canada completed the acquisitions of all of the membership interests of Cochon Properties, LLC ("Cochon"), and Morrison Well Services, LLC ("Well Services").  The acquisitions of Cochon and Well Services enabled Rooster Canada to operate and manage the entire lifecycle of a well from drilling through abandonment and provides the Debtors with a significant advantage in exploiting offshore reserves and resources in the Gulf of Mexico. Because all three entities had a common controlling shareholder, the acquisitions were accounted for using the "continuity of interest" method; as such, all historical financials have been adjusted to incorporate the two wholly-owned subsidiaries. Rooster Canada conducts business through its wholly owned subsidiaries, Rooster Energy, L.L.C., Rooster Petroleum, LLC, Rooster Oil & Gas, LLC, Probe Resources US Ltd., Cochon and Well Services.

---

[4] "Gas prices" in this paragraph refers to the price of a thousand cubic feet of gas, as measured by reference to the price of a prompt month futures contract referencing natural gas meeting the specifications set forth in the FERC- approved tariff of Sabine Pipe Line Company as then in effect at the time of delivery, delivery to Henry Hub, Louisiana, traded on the New York Mercantile Exchange.

7

4847-5923-1295 v9

2909093-000015 06/02/2017

15. The common stock of Rooster Canada trades on the TSX Venture Exchange under the ticker symbol "COQ". Rooster Canada's financial statements are publicly available via the following website: http://www.roosterenergyltd.com/financial-reports.php. The Debtors' consolidated audited financial statements as of 2016 year-end are attached hereto as **Exhibit 1** (the "2016 YE Financial Statements").

16. ***Oil and Gas Operations***. Rooster Petroleum, LLC ("Rooster Petroleum") is the designated operator for four the oil and gas leases (the "Operated Leases"). Of these Operated Leases, Rooster Oil & Gas, LLC ("Rooster Oil") owns a 100% working interest in East Cameron Block 246 (OCS-G-34236), Eugene Island Block 44 (OCS-G-34289), Grand Isle Block 70 (OCS-G-27949), and Vermilion Block 376 (OCS-G-14428) (with the exception of two wells at Vermilion 376, in which it owns 95%). Rooster Petroleum is still recognized as the qualified operator of several other Operated Leases that have expired but having remaining infrastructure that must be removed.

17. Cochon Properties, LLC ("Cochon") is the designated operator and the owner of a 100% working interest in one Operated Lease located at Vermilion Block 67 (OCS-G-00560). Cochon is still recognized as the qualified operator of one other Operated Lease that is expired but has remaining infrastructure that must be removed.

18. Rooster Oil also owns non-operating working interests in two leases (the "Non-Operated Leases"): a 34% working interest at Ship Shoal Block 79 (OCS-G-15277) and a 16.6% working interest at West Cameron Block 215 (OCS-G-04087) that are producing and operated by third parties.

19. ***Well Services Business***. Well Services provides downhole oil and gas well intervention services the majority of which includes well plugging and abandonment services

8

("P&A") in the shallow waters of the GOM with 16 rigless complementary sets of P&A equipment, or "spreads". A spread generally consists of a pump powered by a diesel engine, wireline units, cement blenders, tanks and assorted tools. The combined expertise of the Debtors' oil & gas production and P&A engineers of Well Services allows the Debtors to provide its customers with extensive technical support, exceptional safety performance and high quality customer service. The Debtors' customers include many of the largest operators of wells in the Gulf of Mexico. In addition to its work for third party customers, the Well Services business is strategic to the Debtors' oil & gas production business, because the Debtors utilize the Well Services business to evaluate and acquire mature fields with exploitable upside for minimal costs. Through the utilization of the Well Services P&A expertise, the Debtors are able to cost effectively manage their own asset retirement obligations of the oil and gas operations.

### B. Working Capital Deficiency and Cash Flow Position

20.     At December 31, 2016, the Debtors had a working capital deficiency of $69,049,715 on a consolidated basis. This working capital deficiency included $56,831,791 for the outstanding balance of the Senior Secured Notes (described below). As noted below, the Debtors have further reduced the outstanding balance of the Senior Secured Notes as of the Petition Date.

21.     I expect that one decommissioning contract will generate approximately $14 million of gross revenue, and approximately $7 million in profit from the date of this declaration through the end of 2017 if the Debtors are allowed to use cash collateral to complete the contract. The Debtors intend to use the Chapter 11 process to improve its cash position through renegotiation of debt, reduction of expenses and sale of assets. The Debtors'

9

consolidated statement of cash flows in the 2016 YE Financial Statements indicate that the Debtors were actually cash flow positive in 2016; the main issue from the Debtors' perspective is that the repayment obligations of the Senior Secured Notes prevent the Debtors from maintaining a healthy cash flow position. However, the Debtors are seeking use of cash collateral and/or debtor-in-possession financing to pay the administrative expenses of these cases because, as described in more detail below, the Debtors' senior secured lender has severely restricted the Debtors' access to cash.

### C.  Corporate Structure

22.  The corporate organization structure of the Debtors is set forth below:



23.  All of the Debtors maintain a principal place of business at 16285 Park Ten Place, Suite 120, Houston, Texas 77084. Rooster Canada's sole assets are its interests in the subsidiaries set forth above and its bank accounts, which, as noted below, are all located at Amegy Bank in the United States. The current cash balance of Rooster Canada's bank accounts is approximately $2.3 million.

4847-5923-1295 v9

2909093-000015 06/02/2017

### D. Asset Valuation

24.     While the Debtors are continuing to evaluate their assets in connection with

this case, at this time the Debtors estimate the value their assets as follows:

| | Estimated Valuation Of Collateral | | | Notes |
|---|---|---|---|---|
| | Low | Mid | High | |
| **PDP Reserves Valuation (VR 67)** | | | | Valuation derived utilizing a market discount to NPV-10% |
| Future Net Revenues @ NPV-10% | $ 20,755,095 | $ 20,755,095 | $ 20,755,095 | |
| Market Discount | -87.5% | -75.0% | -62.5% | |
| Current Market Valuation Of PDP Production | $ 2,594,387 | $ 5,188,774 | $ 7,783,161 | |
| | | | | |
| **MWS Equipment** | | | | Valuation derived utilizing a discount to replacement value |
| Number Of Spreads | 16 | 16 | 16 | |
| Replacement Value Per Spread | $ 1,056,368 | $ 1,056,368 | $ 1,056,368 | |
| Replacement Value Of MWS Equipment | $ 16,901,888 | $ 16,901,888 | $ 16,901,888 | |
| Market Discount | -75.0% | -50.0% | -25.0% | |
| Current Market Valuation Of MWS Equipment | $ 4,225,472 | $ 8,450,944 | $ 12,676,416 | Depreciated book value @ $5.7 million |
| | | | | |
| **Decommissioning Contracts** | | | | Valuation derived utilizing a discount to estimated margin |
| Estimated Margin @ Eugene Island 18 | $ 7,015,457 | 7,015,457 | 7,015,457 | |
| Market Discount | -75.0% | -50.0% | -25.0% | |
| Current Market Valuation Of EI 18 Contract | $ 1,753,864 | $ 3,507,728 | $ 5,261,592 | |
| | | | | |
| Estimated Margin @ Vermilion 67 | $ 7,500,000 | 7,500,000 | 7,500,000 | |
| Market Discount | -100.0% | -87.5% | -75.0% | Risk associated with estimating margin in 2026 result in significant discount |
| Current Market Valuation Of VR 67 Contract | $ - | $ 937,500 | $ 1,875,000 | |
| | | | | |
| Remaining Payment @ Ship Shoal 321 | $ 2,000,000 | 2,000,000 | 2,000,000 | |
| Current Market Valuation Of Decom Contracts | $ 3,753,864 | $ 6,445,228 | $ 9,136,592 | |
| | | | | |
| Cash | $ 2,000,000 | $ 2,000,000 | $ 2,000,000 | |
| | | | | |
| **Accounts Receivable** | | | | |
| Oil & Gas Production | $ 888,079 | $ 888,079 | $ 888,079 | |
| JIBs | $ 464,120 | $ 464,120 | $ 464,120 | |
| Morrison Well Services | $ 2,309,645 | $ 2,309,645 | $ 2,309,645 | |
| Total Accounts Receivable | $ 3,661,843 | $ 3,661,843 | $ 3,661,843 | |
| | | | | |
| Probe Resources, US, Bond Collateral | | | | |
| Bond Collateral | $ 800,000 | $ 800,000 | $ 800,000 | |
| Market Discount | -75.0% | -50.0% | -25.0% | Discount reflects risk associated with wells' potential need for remedial work |
| Current Market Valuation Of Bond Collateral | $ 200,000 | $ 400,000 | $ 600,000 | |
| | | | | |
| **Promissory Note Due From Chet Morrison** | | | | Due upon full satisfaction of Subordinated Note #3 by Rooster Oil & Gas, LLC |
| Promissory Note + Accrued Interest | $ 4,365,068 | $ 4,365,068 | $ 4,365,068 | |
| Market Discount | -100.0% | -75.0% | -50.0% | |
| Current Market Valuation Of Promissory Note | $ - | $ 1,091,267 | $ 2,182,534 | |
| | | | | |
| Current Market Valuation Of Other Assets | $ 5,861,843 | $ 7,153,110 | $ 8,444,377 | |
| **Total Collateral** | $ 16,435,566 | $ 27,238,056 | $ 38,040,546 | |

### E. Outer Continental Shelf Regulations

25.     The Debtors' operations on federal oil and gas leases in the GOM are subject to

regulation by the Department of the Interior divisions of the Bureau of Ocean Energy

4847-5923-1295 v9

2909093-000015 06/02/2017

Management ("BOEM"), Bureau of Safety and Environmental Enforcement ("BSEE"), and Office of Natural Resources Revenue ("ONRR"), requiring compliance with BOEM, BSEE and ONRR regulations and with applicable federal and state law, including the Outer Continental Shelf Lands Act. These laws and regulations are subject to change, and many new requirements were imposed by BSEE, BOEM and ONRR after and since the April 2010 Deepwater Horizon incident. For offshore operations, lessees and designated operators of leases, including the applicable Debtors, must obtain BOEM and BSEE approval for exploration, development, and production plans prior to the commencement of such operations. In addition to permits required from other agencies, such as the United States Environmental Protection Agency, lessees and operators, including the Debtors, must obtain a permit from BSEE prior to commencing drilling and comply with regulations governing, among other things, engineering and construction specifications for production facilities, safety procedures, plugging and abandonment of wells, and removal of infrastructure facilities. The ONRR is responsible for management of all revenues associated with both federal offshore and onshore mineral leases, including royalty and revenue collection, distribution, auditing and compliance, investigation and enforcement, and asset management.

26.     To cover the various obligations of lessees and operators on the OCS, such as the cost to plug and abandon wells and decommission and remove platforms and pipelines at the end of production, BOEM generally requires that lessees and operators post bonds or provide other acceptable financial assurances that such obligations will be met, unless BOEM exempts the lessee from such financial assurance requirements.  As discussed below, the Debtors are not exempt from providing bonds and have posted approximately $38 million of surety bonds to satisfy its  obligations on the OCS.

4847-5923-1295 v9

2909093-000015 06/02/2017

27.     Though it no longer has any operations and its wells have been fully decommissioned, Probe Resources US Ltd. owes BSEE a civil penalty of approximately $180,000. Additionally on or about May 22, 2017, Rooster Oil became delinquent in complying with an order from BOEM to provide additional bonding on two Operated Leases in the total amount of $673,194 I have been informed and believe that other than this penalty and missed deadline, the Debtors are in material compliance with their regulatory obligations under the Outer Continental Shelf Lands Act and the regulations of BSEE and BOEM.

## III.     OVERVIEW OF THE DEBTORS' PREPETITION CAPITAL STRUCTURE

28.     Prior to the Petition Date, the Debtors entered into various financing arrangements. Each of the outstanding financing facilities and the amounts owed thereunder and the principal contractual obligations described in further detail below.

### A.     Senior Secured Debt

29.     On November 17, 2014, the Debtors entered a note purchase agreement ("NPA") pursuant to which the Debtors issued senior secured notes in the amount of $45.0 million due on February 14, 2016, as amended. The proceeds of the senior secured notes were used to: 1) repay existing senior debt; 2) fund the $10 million cash portion of the purchase price for Well Services; and 3) payment towards trade accounts payable over sixty days and provide for other general corporate purposes.  The Administrative Agent for the noteholders is Angelo Gordon Energy Servicer, LLC ("Agent").

30.     On June 25, 2015, the Debtors expanded and extended the term of the NPA by entering into an amendment and restatement of the NPA (the "A&R NPA") and issuing new notes in the amount of $60 million that are due on June 25, 2018 (the "Senior Secured Notes"). A portion of the proceeds were used to repay existing senior secured debt in the

4847-5923-1295 v9

2909093-000015 06/02/2017

principal amount of $45 million.  As part of the A&R NPA, the Debtors granted the note holders certain overriding royalty interests in all of the Debtors' oil & gas leases[5] which interests at the time were valued at approximately $2.4 million.

31.     On March 14, 2016, the Debtors entered into the First Amendment and Waiver to the A&R NPA (the "First Amendment"), effective December 31, 2015. Pursuant to the First Amendment, all of the financial and performance covenants of the A&R NPA and scheduled loan amortization were waived for the fiscal quarters ending March 31, 2016 and June 30, 2016. In exchange for the waiver, Rooster Canada paid a waiver fee in the amount of $493,333 on March 14, 2016. The Senior Secured Notes bear interest at a rate equal to Libor + 11.5% per annum with interest payments due monthly; the minimum interest rate is 13.0% per annum. Additionally, from and after March 14, 2016 until June 30, 2016, an 8.0% interest is paid in kind ("PIK Interest"). All PIK Interest is capitalized and compounded by increasing the outstanding principal amount of the Senior Secured Notes. The Debtors' general and administrative costs were not allowed to exceed stipulated limits for the fiscal quarter ending March 31, 2016, and each fiscal quarter thereafter. Pursuant to the First Amendment, the Debtors must comply with the terms of a budget approved by the Senior Secured Noteholders (the "Approved Budget").

32.     On March 16, 2016, the Debtors fixed the price on derivative commodity contracts with settlement dates in April, May, and June 2016, and terminated all derivative commodity contracts with settlement dates on or after July 1, 2016. The Debtors then applied $4.0 million of the proceeds to reduce the principal balance of the Senior Secured Notes.

33.     On July 14, 2016, the Debtors entered into the Second Amendment and Waiver

---

[5] The  oil and gas leases are owned by Rooster Oil and Cochon

4847-5923-1295 v9

2909093-000015 06/02/2017

to the A&R NPA (the "Second Amendment"), effective June 30, 2016. The Second Amendment waived (i) all defaults under the Approved Budget as stipulated in the First Amendment, (ii) the minimum EBITDAX and leverage ratio covenants of the A&R NPA for the fiscal quarter ending September 30, 2016, and (iii) the asset coverage ratio covenant for the fiscal quarter ending December 31, 2016. The scheduled loan amortization was replaced with a requirement for principal repayments summing to no less than $7,532,000 for the six months ending December 31, 2016. The Senior Secured Notes continue to bear interest at a rate equal to Libor + 11.5% per annum (minimum of 13.0%) with interest payments due monthly. The Senior Secured Notes also continue to bear additional PIK interest until December 31, 2016 at a rate of 8.0%. The Debtors failed to pay the principal repayment required on December 31, 2016.

34.     On February 3, 2017, the Debtors and the holders of the Senior Secured Notes entered into a Limited Forbearance and Reservation of Rights Agreement (the "Forbearance Agreement"), whereby the holders agreed to forbear from exercising certain rights and remedies under the A&R NPA.  The Forbearance Agreement terminated on March 3, 2017.

35.     The Debtors entered into a Third Amendment and Waiver to the A&R NPA (the "Third Amendment") with the Agent on March 10, 2017.  On March 24, 2017, the Debtors entered into a non-binding term sheet setting forth the general terms of a potential acceptable restructuring of the A&R NPA.  However, the Debtors and the holders were unable to implement the term sheet through a comprehensive restructuring agreement.

36.     Currently, the outstanding principal balance of the Senior Secured Notes is approximately $53.1 million.

**B.     Subordinate Secured Debt**

4847-5923-1295 v9

2909093-000015 06/02/2017

37.     On April 26, 2012, the Debtors entered into secured credit facilities (the "Subordinate Note #1") with The K2 Principal Fund, L.P. for the principal sum of $6,463,000; effective November 17, 2014, the interest rate was set at 15.5%.

38.     On October 11, 2013, the Debtors entered into another secured credit facility (the "Subordinate Note #2") with The K2 Principal Fund, L.P., as a lender and the administrative agent, and Chester F. Morrison, Jr. (a significant shareholder of Rooster Canada) that provided for borrowing up to CAD $8.0 million. The interest rate is 9% per annum on all advances, and the only advance under the credit facility was CAD $4.0 million.

39.     On March 7, 2014, the Debtors entered into an additional secured credit facility with Chester F. Morrison, Jr. (the "Subordinate Note #3") which provides for borrowing up to $10 million. The interest rate is 14% per annum on all advances. The initial advance in March, 2014, was $4.4 million; in May, 2014, the Debtors drew an additional $2.8 million.  The indebtedness under Subordinate Note #1, Subordinate Note #2 and Subordinate Note #3 is referred to herein as the "Subordinate Secured Debt."

40.     In connection with the Senior Secured Notes, the holders of the Senior Secured Notes, the Debtors and each of the parties to the Subordinate Note #1, Subordinate Note #2 and Subordinate Note #3 (see the Debtors' December 31, 2016 financial statement notes 10(ii), (iii) and (iv)) entered into intercreditor and subordination agreements that prohibit any payments on the Subordinate Secured Debt until the Senior Secured Notes are fully satisfied. Additionally, the Subordinate Note #1, Subordinate Note #2 and Subordinate Note #3 were amended to extend the maturity date of each of those loans to no earlier than one year following the maturity date of the Senior Secured Notes.

41.     As a result of the extension of maturity dates on the Subordinate Note #1,

4847-5923-1295 v9

2909093-000015 06/02/2017

Subordinate Note #2 and Subordinate Note #3 until after satisfaction of the Debtors' obligations owed on the Senior Secured Notes, the maturity dates for all Subordinate Secured Debt is June 25, 2019.

42. Currently, the outstanding principal balance of the Subordinate Secured Debt is approximately $24 million.

### C. Equity Interests

43. Rooster Canada is authorized to issue an unlimited number of common shares (that may be converted to proportionate voting shares) and an unlimited number of preferred shares issuable in series with no par value.

44. As of the Petition Date, there were 60,989 proportionate voting shares (each convertible to 1,000 common shares) and 263,110,502 common shares issued and outstanding; the issued share capital on a fully diluted basis is the equivalent of 324,099,502 common shares. No preferred shares are issued or outstanding. Of the 324,099,502 outstanding share capital, Chester F. Morrison, Jr. holds, either directly or indirectly through corporate entities he controls, 274,713,757 shares (on a diluted basis), or approximately 85% of the issued share capital. Mr. Morrison is the chairman of Rooster Canada's board of directors.

45. As of the Petition Date, Rooster Canada had 13,429,813 of warrants outstanding with an exercise price of USD$0.67 per share; the warrants expire in October, 2017. During 2016 and the months of 2017 through the Petition Date, no warrants were exercised.

46. During the period from January 1, 2016 through the Petition Date, Rooster Canada did not grant stock options, had no options exercised, and 1,685,354 options were

4847-5923-1295 v9

2909093-000015 06/02/2017

forfeited. As of the Petition Date, 16,553,836 options were outstanding.

### D. Other Secured Debt

47.     In the ordinary course of business, the Debtors routinely transact business with a number of third-party contractors and vendors who may be able to assert privileges or liens against the Debtors and their property (such as equipment and, in certain circumstances, mineral interests and leases) if the Debtors fail to pay for goods delivered or services rendered. These parties perform various oil field services, including manufacturing and repairing equipment and component parts, necessary for the Debtors' oil field activities.

### E. Trade Debt

48.     In the ordinary course of business, the Debtors incur trade debt with numerous vendors in connection with products and services that support their oil and gas exploration, development, production and decommissioning activities. I am informed that, as of the Petition Date, the Debtors' unsecured trade debt is approximately $7.1 million in the aggregate, payable to approximately 200 creditors on account of prepetition goods and services provided to the Debtors.  This amount excludes approximately $10.2 million of long-term trade debt owed to Chet Morrison Contractors, LLC, a non-debtor entity owned indirectly and controlled by Chester F. Morrison, Jr., and approximately $800,000 of unsecured payables related to excess working capital delivered when Rooster Canada purchased Cochon and Well Services.

### F. Hedging Arrangements

49.     To reduce its exposure to declines in oil and natural gas prices, Rooster Petroleum entered into a prepetition hedging arrangement with BP Energy Company ("BP") pursuant to that certain ISDA 2002 Master Agreement dated November 14, 2014 and the

4847-5923-1295 v9

2909093-000015 06/02/2017

confirmation of transaction dated July 14, 2016 (collectively, the "<u>Hedging Agreement</u>").

### G. Performance Bonds

50.     As discussed above, as a lessee and operator of oil and gas leases on the OCS in the GOM, the applicable   Debtors must comply with, among other things, rules and regulations promulgated by BOEM. In particular, the Debtors have provided   financial assurances to BOEM ( and in limited instances to the Debtors' successors in lease title) in order  to comply with such regulations, including the  payment of royalties due under leases and as security to assure satisfaction of well P&A obligations. Historically, to meet BOEM's financial assurance requirements, the Debtors have provided surety bonds issued by private insurance or surety companies to BOEM.   Below is a table summarizing the outstanding surety bonds issued for the Debtors, by entity and lease.   All of the surety bonds are guaranteed by third parties and some are also secured by cash (or cash equivalent) collateral:

4847-5923-1295 v9

2909093-000015 06/02/2017

| AREA/BLOCK | BOND NUMBER | TYPE BOND | AMOUNT OF BOND | GUARANTY or COLLATERAL | OBLIGEE | SURETY |
|---|---|---|---|---|---|---|
| **Rooster Petroleum, LLC, and Rooster Oil & Gas, LLC** | | | | | | |
| HI A494 OCS-G 3244 | SU46251 | Supplemental | $3,060,000.00 | CMC LC & Rooster Cas | BOEM | Aspen Insurance |
| EI 28 - OCS-G 05479 | SU46253 | Supplemental | $1,820,000.00 | CMC LC & Rooster Cas | BOEM | Aspen Insurance |
| GA 223 - OCS-G 03738 | SU46252 | Supplemental | $20,000.00 | CMC LC & Rooster Cas | BOEM | Aspen Insurance |
| GI 70  OCS-G27949 | SU46257 | Supplemental | $900,000.00 | CMC LC & Rooster Cas | BOEM | Aspen Insurance |
| HI 115 OCS-G 18936 | SU46256 | Supplemental | $490,000.00 | CMC LC & Rooster Cas | BOEM | Aspen Insurance |
| EI 44 OCS-G 34289 | SU46258 | Supplemental | $300,000.00 | CMC LC & Rooster Cas | BOEM | Aspen Insurance |
| Texas | B003988 | Areawide Operator | $25,000.00 | CMC & Chet, et al | TX Railroad Comm | US Specialty |
| OCS | B003203 | Area Pipeline ROW | $300,000.00 | CMC & Chet, et al | MMS/BOEM | US Specialty |
| OCS(CA 63 & CSP Pipeline on | B004123 | Area Pipeline ROW | $300,000.00 | CMC & Chet, et al | MMS/BOEM | US Specialty |
| Belle Isle/LA SL #9680 (CA 63) | B003539 | Performance | $250,000.00 | CMC & Chet, et al | LA Office of Conservation | US Specialty |
| EC 39 - OCS-G 34792 | B008035 | Lease Specific | $50,000.00 | CMC & Chet, et al | BOEM | US Specialty |
| EC 246 OCS-G 34236 | B007641 | Lease Specific | $50,000.00 | CMC & Chet, et al | BOEM | US Specialty |
| EI 44 - OCS-G 34289 | B007640 | Lease Specific | $50,000.00 | CMC & Chet, et al | BOEM | US Specialty |
| HI 154 - OCS-G 2357 | B008698 | Lease Specific (RUE) | $950,000.00 | CMC & Chet, et al | BOEM | US Specialty |
| HI A-494 - OCS-G 03244 | B004251 | Performance | $500,000.00 | CMC & Chet, et al | Hunt Petroleum Company | US Specialty |
| VR 20  OCS-G 34799 | B007974 | Lease Specific | $50,000.00 | CMC & Chet, et al | BOEM | US Specialty |
| SS 172 OCS-G 35234 | B008671 | Lease Specific | $50,000.00 | CMC & Chet, et al | BOEM | US Specialty |
| VR 376 OCS-G 14428 | B007250 | Performance | $2,250,000.00 | CMC & Chet, et al | Apache | US Specialty |
| WC 215  OCS-G 04087 | B005252 | Performance | $150,000.00 | CMC & Chet, et al | Hunt Petroleum Company | US Specialty |
| EC 37 OCS-G35577 | B009330 | Lease Specific | $50,000.00 | CMC & Chet, et al | BOEM | US Specialty |
| OCS | B003204 | Areawide Operator | $3,000,000.00 | CMC & Chet, et al | MMS/BOEM | US Specialty |
| **Rooster Total** | | | **$14,615,000.00** | **$1,696,800.00** | | |
| **Cochon Properties, LLC** | | | | | | |
| VR 67  OCS-G 0560 | 105812476 | Supplemental | $5,280,000.00 | Nexen only | BOEM | Travelers |
| WD 44  OCS-G 0137 | 105812474 | Supplemental | $2,070,000.00 | Nexen only | BOEM | Travelers |
| WD 45  OCS-G 0138 | 105812475 | Supplemental | $11,305,000.00 | Nexen only | BOEM | Travelers |
| EI 18 Field Leases (9) | B007276 | Performance | $1,250,000.00 | CMC & Chet | LA Office of Conservation | US Specialty |
| VR 67 OCS-G 0560 | B008092 | Lease Specific | $500,000.00 | CMC & Chet | BOEM | US Specialty |
| WD 44 OCS-G 0137 | B008093 | Lease Specific | $500,000.00 | CMC & Chet | BOEM | US Specialty |
| WD 45 OCS-G 0138 | B008094 | Lease Specific | $500,000.00 | CMC & Chet | BOEM | US Specialty |
| Gulf Of Mexico | B008095 | Area Pipeline ROW | $300,000.00 | CMC & Chet | BOEM | US Specialty |
| **Cochon Total** | | | **$21,705,000.00** | **$0.00** | | |
| **Probe Resources US Ltd.** | | | | | | |
| EC 37 OCS-G 30304 | SU46274 | Supplemental (RUE) | $165,000.00 | CMC  & Rooster | BOEM | Aspen Insurance |
| EC 246 OCS-G 24805 | RLB0011723 | Lease Specific | $500,000.00 | | BOEM | RLI Insurance |
| ST 214 OCS-G24979 | RLB0012256 | Lease Specific | $500,000.00 | | BOEM | RLI Insurance |
| ST 198 OCS-G30111 | RLB0012365 | Supplemental | Cancelled | | BOEM | RLI Insurance |
| ST 198  OCS-G32214 | RLB0013233 | Supplemental | Cancelled | | BOEM | RLI Insurance |
| ST 198  OCS-G32214 | RLB0012618 | Lease Specific | $500,000.00 | $500,000.00 | BOEM | RLI Insurance |
| ST 198 RUE | RLB0011943 | Performance | Cancelled | | Apache & Maritech | RLI Insurance |
| Gulf of Mexico | RLB0012366 | Area Pipeline ROW | $300,000.00 | $300,000.00 | BOEM | RLI Insurance |
| **Probe Total** | | | **$1,965,000.00** | **$800,000.00** | | |
| **GRAND TOTAL** | | | **$38,285,000.00** | **$2,496,800.00** | | |

## IV.  EVENTS LEADING TO CHAPTER 11

51.    As a result of the general decline in oil and gas prices and the reluctance of the holders of the Senior Secured Notes to allow the Debtors to complete a planned development drilling program, as described above, as well as the typical production trajectory of GOM wells, approximately one year ago the Debtors began to experience significant cash shortfalls in their oil and gas production.  In other words, the Debtors were not producing sufficient revenues from the production of oil and gas at their wells in the GOM to cover the operating

4847-5923-1295 v9

2909093-000015 06/02/2017

expenses for those wells.

52. Compounding these problems is the notoriously seasonal nature of the Well Services business. Well Services generates significant revenues in the summer and fall, when weather conditions are typically favorable, and less revenue during the winter and spring, when weather conditions become more volatile.

53. In the past, the Debtors could cover shortfalls in their other business segments through excess revenue from the Well Services business. However, after the restructure of its Senior Secured Debt in March 2014, the Agent progressively exercised rights under the loan documents to restrict the Debtors' cash flow and to increase the interest paid by the Debtors on the Senior Secured Debt.

54. Although the Debtors entered into the Forbearance Agreement in February 2017, the Debtors' $7 million cash position continued to deteriorate, as about $5.7 million, was applied to the Senior Secured Debt, with the balance used to fund operations. As of the beginning of May 2017, the holders indicated that they would only fund payroll and no other operating expenses of the Debtors associated with well P&A. The holders of the Senior Secured Debt further involved themselves in the minutiae of the Debtors' businesses by dictating, through the disbursement of funds from blocked bank accounts at Amegy as further described hereinafter, which invoices, or portions of invoices, that the Debtors could and could not pay with respect to their oil and gas production business. This has caused a liquidity crises for the Debtors and impaired the ability of the Debtors to continue operations as vendors have progressively ceased to provide needed goods and services.

## PART II

55. In furtherance of the objective of successfully restructuring their capital

21

structure, the Debtors have sought approval of the First Day Motions and related orders (the "Proposed Orders"), and respectfully request that the Court consider entering the Proposed Orders granting such First Day Motions. For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in the First Day Motions.

56. I have reviewed each of the First Day Motions, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe that the relief sought in each of the First Day Motions: (a) is vital to enabling the Debtors to make the transition to, and operate in, Chapter 11 with minimal interruption and disruption to their businesses or loss of productivity or value and (b) constitutes a critical element in the Debtors' ability to successfully restructure their capital structure and maximize value for the benefit of the Debtors' estates and all stakeholders.

## I.    ADMINISTRATIVE AND PROCEDURAL PLEADINGS

### A.    Joint Administration Motion

57. The Debtors seek the joint administration of their Chapter 11 Cases for procedural purposes only. Many of the motions, hearings, and other matters involved in these Chapter 11 Cases will affect all of the Debtors. Thus, I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders and other pleadings, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates. I also believe that joint administration of these Chapter 11 Cases will ease the administrative burden on the Court and all parties in interest.

4847-5923-1295 v9

2909093-000015 06/02/2017

### B.    Schedules Extension Motion

58.    In the Schedules Extension Motion, the Debtors seek additional time to file their schedules and statements of financial affairs.  The Debtors businesses are a large and complex enterprise, with numerous creditors and other parties in interest.  In light of the Debtors' financial difficulties and limited resources, it lacks excess staffing capacity to help prepare its Schedules.  Additionally, Rooster Canada's stock is publicly traded on the TSX Venture Exchange, a Canadian stock exchange.  Furthermore, I and the other members of the Debtors' management and professionals have devoted significant time to the emergency relief discussed in this Declaration.  The Debtors therefore need additional time to prepare their schedules and statements required by the Bankruptcy Code and Bankruptcy Rules.

### C.    Notice Procedures Motion

59.    In the Notice Procedures Motion, the Debtors seek an order to limit notice so that not all parties in interest in the case will receive notice of certain proceedings.  The Debtors collectively have over 200 creditors and other parties in interest in these Cases to whom notice must be given.  Such notice would be extremely burdensome to the Debtors, costly to their estates and, in many instances, unnecessary if the matters have no bearing on certain parties.  I have been informed and believe that the notice procedures described in the Notice Procedures Motion will provide adequate notice to parties of the proceedings in these cases that affect them, and adequate notice to all parties in certain circumstances for major proceedings.  I believe these notice procedures are in the best interest of the Debtors and their estates.

### D.    Retention Applications

60.    I believe that the retention of chapter 11 professionals is essential to the

4847-5923-1295 v9

2909093-000015 06/02/2017

Chapter 11 Cases. Accordingly, in connection with these Chapter 11 Cases, the Debtors anticipate that they will request permission to retain, among others, the following professionals: (a) Baker, Donelson, Bearman, Caldwell & Berkowitz, PC as general bankruptcy counsel ; (b) Opportune LLP, as financial advisor; and (c) Donlin, Recano & Company, Inc. as claims, noticing, solicitation and balloting agent. I believe that the above professionals are well qualified to perform the services contemplated by their various retention applications, the services are necessary for the success of these Chapter 11 Cases, and the professionals will coordinate their services to avoid duplication of efforts. I understand that the Debtors may find it necessary to seek retention of additional professionals as the Chapter 11 Cases progress.

## II. BUSINESS OPERATION MOTIONS

### A. Cash Management Motion

61. In the Cash Management Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to (i) maintain and use their existing bank accounts, cash management system, and business forms, (ii) honor certain prepetition obligations related thereto, and (iii) continue to perform intercompany transactions in the ordinary course of the Debtors' business. The Debtors also request in the Cash Management Motion that the Court authorize all banks with which the Debtors maintain accounts to continue to maintain, service and administer such accounts.

a. The Debtors' Cash Management System and Bank Accounts

62. In the ordinary course of their businesses, the Debtors maintain a complex cash management system (the "Cash Management System") that includes multiple deposit accounts earmarked for specific purposes. I believe the Cash Management System is integral to the

4847-5923-1295 v9

2909093-000015 06/02/2017

operation and administration of the Debtors' business and allows the Debtors to efficiently (a) identify the Debtors' cash requirements, (b) transfer cash as needed to respond to cash requirements, and (c) efficiently monitor and control all of the Debtors' cash receipts and disbursements. I also believe that the Cash Management System is similar to those used by many other companies of comparable size and complexity to collect, transfer, and disburse funds in a cost-effective and efficient manner.

63. The Cash Management System is managed by the financial personnel at the Debtors' Headquarters in Houston, Texas. I believe that the Debtors' control over the administration of the various bank accounts to effect the collection, disbursement, and movement of cash facilitates results in accurate cash forecasting and reporting and enables the Debtors to, among other things, monitor the collection and disbursement of funds. Additionally, as a result of certain Deposit Account Control Agreements with the Debtors' Secured Lender and its depository bank, ZB, N.A. d/b/a Amegy Bank ("Amegy"), the Cash Management System allows the Agent to monitor its cash collateral.

64. I believe that the Cash Management System is organized in a way that respects the separate cash funding and operating needs of the Debtors. A summary of the Cash Management System and the Debtors' bank accounts (the "Bank Accounts") is described in the table below. [6]

| Account Holder | Bank Name | Account No. | DACA Status | Purpose |
|---|---|---|---|---|
| Rooster Energy Ltd. | Amegy Bank, Houston TX | x7125 | Blocked | Operating Account; Funds from subsidiaries' Main Accounts are swept into this account at the end of |

---

[6] I believe, and have undertaken reasonable efforts to ensure, that this table lists all of the Existing Accounts. In the event that any Existing Account has been inadvertently omitted, the Debtors request that the relief sought by the Cash Management Motion be deemed to apply to any such Existing Account.

4847-5923-1295 v9

2909093-000015 06/02/2017

| | | | | each day. |
|---|---|---|---|---|
| Rooster Energy Ltd. | Amegy Bank, Houston TX | x7117 | Springing | Disbursement Account; Funds are transferred into this account from the Operating Account to be allocated to the subsidiaries' disbursement accounts according to the Secured Lender's approved budget. |
| Rooster Petroleum, LLC | Amegy Bank, Houston TX | x4796 | Blocked | Main Account; Revenue of Rooster Petroleum, LLC is paid into this account, and funds are swept daily from this account to Rooster Energy, Ltd.'s Operating Account. |
| Rooster Petroleum, LLC | Amegy Bank, Houston TX | x4826 | Springing | Revenue Account; After receipt of funds transferred from Rooster Energy Ltd. Disbursement Account, funds are used to pay royalties. |
| Rooster Petroleum, LLC | Amegy Bank, Houston TX | x4834 | Springing | Payroll Account; After receipt of funds transferred from Rooster Energy Ltd. Disbursement Account, funds are used to pay employees. |
| Rooster Petroleum, LLC | Amegy Bank, Houston TX | x4818 | Springing | AP Account; After receipt of funds transferred from Rooster Energy Ltd. Disbursement Account, funds are used to pay accounts payable. |
| Rooster Oil & Gas, LLC | Amegy Bank, Houston TX | x5237 | Blocked | Main Account; Revenue of Rooster Oil & Gas, LLC is paid into this account, and funds are swept daily from this account to Rooster Energy, Ltd.'s Operating Account. |
| Cochon Properties, LLC | Amegy Bank, Houston TX | x1789 | Blocked | Main Account; Revenue of Cochon Properties, LLC is paid into this account, and funds are swept daily from this account to Rooster Energy, Ltd.'s Operating Account. |
| Cochon Properties, LLC | Amegy Bank, Houston TX | x1797 | Springing | AP Account; After receipt of funds transferred from Rooster Energy Ltd. Disbursement Account, funds are used to pay accounts payable. |
| Cochon Properties, LLC | Amegy Bank, Houston TX | x1805 | Springing | Revenue Account; After receipt of funds transferred from Rooster Energy Ltd. Disbursement Account, |

4847-5923-1295 v9

2909093-000015 06/02/2017

| | | | | |
|---|---|---|---|---|
| | | | | funds are used to pay royalties. |
| Morrison Well Services, LLC | Amegy Bank, Houston TX | x1813 | Blocked | Main Account; Revenue of Morrison Well Services, LLC is paid into this account, and funds are swept daily from this account to Rooster Energy, Ltd.'s Operating Account. |
| Morrison Well Services, LLC | Amegy Bank, Houston TX | x1821 | Springing | AP Account; After receipt of funds transferred from Rooster Energy Ltd. Disbursement Account, funds are used to pay accounts payable. |
| Morrison Well Services, LLC | Amegy Bank, Houston TX | x1839 | Springing | Revenue Account; After receipt of funds transferred from Rooster Energy Ltd. Disbursement Account, funds are used to pay employees. |

65.     Pursuant to pre-existing directions and arrangements with third party payors, all revenue generated by the Debtors is deposited into the Main Accounts for each of the four main operating subsidiaries: Rooster Petroleum, LLC, Rooster Oil & Gas, LLC, Cochon Properties, LLC, and Morrison Well Services, LLC.  Probe Resources US Ltd., which no longer generates oil and gas production revenues, has no bank accounts.

> b.     Continued Use of the Debtors' Existing Cash Management System and the Bank Accounts

66.     I believe that the Cash Management System is an ordinary-course, customary, and essential business practice, the continued use of which is essential to the Debtors' business operations during these Chapter 11 Cases and their goal of maximizing value for the benefit of all parties in interest. It also allows the Debtors to efficiently identify their cash requirements, transfer cash as needed to respond to those requirements, and track all intercompany transfers. I believe that any disruption in the collection of funds as currently implemented would adversely (and perhaps irreparably) affect the Debtors' ability to maximize value and successfully restructure. Moreover, such a disruption would be wholly

4847-5923-1295 v9

2909093-000015 06/02/2017

unnecessary, because the Cash Management System provides a valuable and efficient means for the Debtors to address their cash management requirements and, to the best of the my knowledge, the Bank Accounts are in a financially stable institution that is insured by the Federal Deposit Insurance Corporation ("FDIC") (up to an applicable limit per Debtor per institution). Consequently, maintaining the existing Cash Management System without disruption is both essential to the Debtors' ongoing operations and in the best interests of the Debtors, their estates, and all interested parties. Accordingly, the Debtors request that they be allowed to maintain and continue to use the Cash Management System and the Bank Accounts.

67. If the relief requested in the Cash Management Motion is granted, the Debtors will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them prior to the Petition Date, other than those authorized by this Court. To prevent the possible inadvertent payment of prepetition claims, except those otherwise authorized by the Court, I have been informed that the Debtors will work closely with Amegy to ensure appropriate procedures are in place to prevent checks issued prepetition from being honored absent this Court's approval and to ensure that no third-party with automatic debit capabilities is able to debit amounts attributable to prepetition obligations.

68. Additionally, if Amegy is a party to a Uniform Depository agreement with the United States Trustee, I have been informed that the Debtors will (a) contact Amegy, (b) provide the Debtors' employer identification numbers, and (c) identify each Bank Account held at Amegy as being held by a debtor in possession in a bankruptcy case. If Amegy is not party to a Uniform Depository agreement with the United States Trustee, my understanding is that the Debtors will use their good-faith efforts to cause Amegy to execute a Uniform

28

Depository agreement in a form prescribed by the United States Trustee.

69.     In the interest of maintaining the continued and efficient operation of the Cash Management System during the pendency of these Chapter 11 Cases, in the Cash Management Motion, the Debtors request that Amegy be authorized to continue to administer, service, and maintain the Bank Accounts as such accounts were administered, serviced, and maintained prepetition, except for the deposit account control agreements with the Secured Lender, without interruption and in the ordinary course (including making deductions for bank fees), and to honor any and all checks, drafts, wires, ACH transfers, electronic fund transfers, or other items presented, issued, or drawn on the Bank Accounts in connection with a claim arising on or after the Petition Date.

70.     The Debtors further request in the Cash Management Motion that they be authorized to implement such reasonable changes to the Cash Management System as the Debtors may deem necessary or appropriate, including, without limitation, closing any of the Bank Accounts or opening any additional Bank Accounts following the Petition Date (the "New Accounts"),  wherever the Debtors deem that such accounts are needed or appropriate, and whether or not the banks in which the New Accounts are opened are designated depositories in the Western District of Louisiana.  My understanding is that, notwithstanding the foregoing, any New Account that the Debtors open will be (a) at Amegy or with a bank that is organized under the laws of the United States of America or any state therein, and that is insured by the FDIC or the Federal Savings and Loan Insurance Corporation and (b) designated a "Debtor in Possession" account by the relevant bank. The Debtors request that the relief sought in the Cash Management Motion extend to any New Accounts and that any order approving the Cash Management Motion provide that the New Accounts are deemed to

4847-5923-1295 v9

2909093-000015 06/02/2017

be Bank Accounts and are similarly subject to the rights, obligations, and relief granted in any order granted pursuant to the Cash Management Motion. I understand that the Debtors will provide the United States Trustee and the Secured Lender with written notice of any New Accounts that are opened. In furtherance of the foregoing, the Debtors also request that the relevant Banks be authorized to honor the Debtors' requests to open or close (as the case may be) such Bank Account(s) or New Account(s).

c.    Continued Use of the Debtors' Existing Checks and Business Forms

71.    To minimize expenses to their estates, I understand the Debtors are also seeking authorization in the Cash Management Motion to continue using all existing checks substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' status as debtors in possession; provided, however, that when the Debtors generate new checks during the pendency of these Chapter 11 Cases such checks will include a legend referring to the Debtors as "Debtor in Possession." The Debtors also seek authority to use all existing correspondence and other business forms (including, without limitation, letterhead, purchase orders and invoices) without reference to the Debtors' status as debtors in possession.

72.    I believe that changing the Debtors' existing checks, correspondence, and other business forms would be expensive, unnecessary, and burdensome to the Debtors' estates. Further, such changes would be disruptive to the Debtors' business operations and would not confer any benefit upon those dealing with the Debtors. For these reasons, the Debtors request that they be authorized to use their existing check stock, all correspondence, and other business forms, without being required to place the label "Debtor in Possession" on any of the foregoing.

30

d.    <u>Waiver of Certain Requirements of the United States Trustee</u>

73.    The Debtors further request in the Cash Management Motion, that this Court grant a waiver of certain bank account and related requirements of the United States Trustee to the extent that such requirements are inconsistent with (a) the Debtors' existing practices under the Cash Management System or (b) any action taken by the Debtors in accordance with any order granting the Cash Management Motion or any other order entered in the Chapter 11 Cases. I understand that to supervise the administration of chapter 11 cases, the United States Trustee has established certain operating guidelines for debtors in possession in order to supervise the administration of chapter 11 cases.   I have been informed that these requirements (the "<u>UST Requirements</u>") require chapter 11 debtors to, among other things: (i) close all existing bank accounts and open new debtor in possession bank accounts; (ii) establish one debtor in possession account for all estate monies required for the payment of taxes, including payroll taxes; (iii) maintain a separate debtor in possession account for cash collateral; and (iv) obtain checks for all debtor in possession accounts that bear the designation "Debtor In Possession," the bankruptcy case number, and the type of account. It is my understanding that the UST Requirements are designed to draw a clear line of demarcation between prepetition and post-petition transactions and operations and prevent the inadvertent post-petition payment of prepetition claims. As set forth above, I believe that (i) the Debtors are able to work with Amegy to ensure that this goal of separation between the prepetition and post-petition periods is observed and (ii) enforcing certain of these UST Requirements would disrupt the Debtors' operations and impose a financial burden on the Debtors' estates.

74.    In light of the complexity of the Cash Management System, I believe that it would be significantly onerous for the Debtors to meet the requirement of closing all existing

31

bank accounts and opening new debtor in possession bank accounts. Indeed, not only would the Debtors be unnecessarily inconvenienced, but so would the counterparties with whom the Debtors do business (the majority of whom wire remittances directly to the Debtors' US Bank Revenue and Operating accounts as further described in the Cash Management Motion).

75.    Furthermore, I believe that it would be unnecessary and inefficient to require the Debtors to abide by the UST Requirements to establish specific debtor in possession accounts for tax payments (including payroll taxes) and to deposit to such specific tax accounts sufficient funds to pay any tax liability (when incurred) associated with the Debtors' payroll and other tax obligations would be unnecessarily burdensome. I believe that the Debtors can pay their tax obligations most efficiently from the existing disbursement and checking accounts maintained at Amegy in accordance with their existing practices; that the United States Trustee can adequately monitor the flow of funds into and out of such accounts; and that the creation of new debtor in possession accounts designated solely for tax obligations would be unnecessary and inefficient.

76.    Additionally, I believe it is unnecessary to require the Debtors to abide by the UST Requirement to establish specific debtor in possession accounts for cash collateral. As set forth in the Debtors' Cash Collateral Motion, the Debtors have provided significant safeguards to ensure that those who have an interest in cash collateral are adequately protected and such persons have been provided with notice of the proposed use of such cash collateral.

77.    Finally, for the reasons noted above, I believe that compliance with the UST Requirement that a debtor must immediately obtain checks for all debtor in possession accounts that bear the designation "Debtor In Possession," the bankruptcy case number, and the type of account, is unnecessarily burdensome in these Chapter 11 Cases.

4847-5923-1295 v9

2909093-000015 06/02/2017

e. Continued Ordinary-Course Intercompany Transactions and Post-petition Intercompany Claims

78. In connection with the daily operation of the Debtors' businesses, as funds are moved within the Cash Management System, at any given time, I understand that there may be intercompany claims owing by one Debtor to another Debtor. Specifically, each evening, all funds in the Main Accounts are swept into the Operating Account of Rooster Canada  After payments are made to the Agent on the Debtors' secured indebtedness, funds are then disbursed to the Revenue, Payroll, or AP Accounts according to the budget approved by the Agent.  As noted above, Rooster Petroleum as the primary operating company on behalf of the other Debtors, maintains a Revenue Account, through which it makes royalty payments, a Payroll Account, and an Accounts Payable Account.  Rooster Oil  has no employees and is merely a passive investor in leases; any royalties or accounts payable it may owe are paid by Rooster Petroleum.  Similarly, Cochon has no employees but instead relies primarily on the employees of Rooster Petroleum to conduct its business; however, it maintains a Revenue Account and an Accounts Payable Account in order to separately account for its expenses.  As a service company, Well Services does not have royalties to pay; accordingly, it pays employees out of the Revenue Account, and also maintains an Accounts Payable Account.

79. With respect to all of the intercompany transactions undertaken by the Debtors (collectively, the "Intercompany Transactions"), the Debtors maintain records of all fund transfers and can ascertain, trace, and account for the Intercompany Transactions. At the same time, if the Intercompany Transactions were to be discontinued, I believe that the Cash Management System and the related administrative controls would be disrupted to the Debtors' detriment.  Currently, the following intercompany receivables are due and owing among the Debtors:

33

4847-5923-1295 v9

2909093-000015 06/02/2017

| Intercompany Creditor | Intercompany Debtor | Balance |
|---|---|---|
| Morrison Well Services, LLC | Cochon Properties, LLC | $11,215,758.26 |
| Morrison Well Services, LLC | Rooster Petroleum, LLC | $5,038,147.15 |

80. To ensure that each individual Debtor will not fund the operations of another entity at the expense of such Debtor's creditors, the Debtors request that all post-petition claims arising from Intercompany Transactions (the "Intercompany Claims") against a Debtor by another Debtor, arising after the Petition Date, be granted superpriority administrative claim status, subject and subordinate only to other superpriority administrative claims granted pursuant to any order of the Court. I have been informed and believe that if post-petition Intercompany Claims are granted superpriority administrative claim status, then each individual Debtor on whose behalf another Debtor has used funds or incurred expenses will continue to bear ultimate repayment responsibility, thereby protecting the interests of each individual Debtor's creditors. Accordingly, I believe that the Court should grant superpriority status to the Intercompany Claims.

### B. Cash Collateral Motion

81. In the Cash Collateral Motion, the Debtors request the ability to use cash receipts and equivalents constituting the Cash Collateral of the Prepetition Secured Parties.

82. I understand that, as adequate protection for any diminution in value during these cases, the Debtors have agreed to provide the Prepetition Secured Parties with adequate protection that includes: (a) granting of adequate protection liens to the Prepetition Secured Parties on all property and assets of the Debtors; (b) granting of allowed superpriority claims solely to the extent of the aggregate diminution in value of the Prepetition Secured Parties' interest in the Prepetition Collateral from and after the Petition Date, if any; and (c) certain other budget and reporting requirements.

4847-5923-1295 v9

2909093-000015 06/02/2017

83.     I believe that the Debtors need authorization to use the Cash Collateral to pay operating expenses associated with their business operations, all in accordance with the budget (the "Budget").  Indeed, I believe that absent such relief, the Debtors' businesses will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors.  I have reviewed the Budget and believe that it is a reasonable estimate of the revenue and expenses that the Debtors expect to receiver over the 13-week period the Budget covers.

84.     I also believe that the Debtors' use of Cash Collateral is critical to preserve the value of their assets and property during the Chapter 11 Cases and will avoid immediate and irreparable harm to the Debtors' estates and creditors. The use of Cash Collateral constituting proceeds of the Prepetition Collateral generated following the Petition Date will also allow the Debtors to avoid the increased costs and administrative burdens that would follow if the Debtors were required to immediately segregate and not use their operating cash. If the Interim Order granting the Cash Collateral Motion is entered, I believe the Debtors will have ample working capital to operate their businesses and provide an opportunity to maximize value for the benefit of their stakeholders. At the same time, I believe that the Prepetition Secured Parties will be adequately protected with the adequate protection liens on all assets of the Debtors and the budgetary constraints provided in the proposed order on use of cash collateral.

85.     I have been informed that the Debtors, with the assistance of their financial advisors, have prepared a Budget showing sources and uses of cash necessary for the Debtors' operations on a weekly basis for the first thirteen (13) weeks of these Chapter 11 Cases. Specifically, the Budget shows the Debtors' forecasted receipts and disbursements from the

4847-5923-1295 v9

2909093-000015 06/02/2017

Petition Date through the end of August 2017 (the "Budget Period"). As set forth in the Interim Order and the Budget, the Debtors intend to use Cash Collateral for, among other things working capital, general corporate purposes, and administrative costs and expenses of the Debtors incurred in the Chapter 11 Cases, including first-day related relief subject to the terms hereof.

86.     The Debtors will adhere to the Budget during the Budget Period, subject to their ability to: (i) carry over any amounts not expended for weekly budgeted items not paid through any subsequent week within a four-week period thereafter, (ii) expend up to fifteen percent (15%) more than the budgeted amount (plus any permitted carry forward) for a specific week in such week so long as the aggregate expenditures during the Budget Period do not exceed the total shown on the Budget for such interim period by more than fifteen percent (15%) (excluding Excluded Disbursements (as defined in the Cash Collateral Interim Order)) payable to the professionals of the Prepetition Secured Parties), and (iii) pay amounts incurred from and after the Petition Date, in addition to or for categories not listed in the Budget with the prior written consent of the Prepetition Agent (collectively, the "Authorized Variances").

87.     I understand that the Authorized Variances will be tested initially on the date that is four weeks after the Petition Date, and will continue thereafter, each test covering the trailing four-week period (each, a "Monthly Testing Period"). In the event the Debtors' expenditures exceed any Authorized Variances during any Monthly Testing Period, I have been informed that the Debtors reserve the right to modify the Budget and seek further relief from this Court regarding their continued use of Cash Collateral in accordance with such modified Budget.

## C.     DIP Financing Motion

36

4847-5923-1295 v9

2909093-000015 06/02/2017

88.     In the DIP Financing Motion, the Debtors request authority to borrow up to $525,000.00 (the "DIP Loan") from Corn Meal, LLC (the "DIP Lender").  I have been informed and believe that the DIP Lender is a special purpose entity formed and owned by Chester F. Morrison, Jr., the largest shareholder in Rooster Canada and a holder of a significant portion of the Subordinated Secured Debt as well as other unsecured debt through his control of Chet Morrison Contractors, LLC.

89.     The proceeds of the Post-petition Financing will be used to fund costs of administering Debtors' estates, including without limitation, fees assessed by the Office of the United States Trustee and the Clerk of Court and fees and expenses of professionals of the estates, as approved by the Bankruptcy Court.  To be clear, I do not believe that the DIP Loan proceeds are sufficient to allow the Debtors to fund operations absent approval of the use of Cash Collateral.

90.     The DIP Lender has already advanced a portion of the DIP Loan to fund the retainers of certain of the Debtors' proposed professionals in these cases.  These amounts were received from Jones Walker, LLP on behalf of the DIP Lender.  I am informed and believe that Chester F. Morrison, Jr. is a client of Jones Walker, LLP.  Specifically, the amounts advanced by the DIP Lender are as follows:

- Baker Donelson Bearman Caldwell & Berkowitz, P.C., proposed counsel to the Debtors received a $100,000 retainer for professional fees and expenses and $13,000 for filing fees in connection with the Debtors' bankruptcy petitions;

- Opportune LLP, proposed financial advisor for the Debtors received a $75,000 retainer for professional fees and expenses; and

- Donlin, Recano & Company, Inc., proposed claims and noticing agent for the

4847-5923-1295 v9

2909093-000015 06/02/2017

Debtors received a $25,000 retainer for professional fees and expenses.

91.     I have been informed and believe that the DIP Lender will require the Debtors to conduct a Section 363 auction of Rooster Energy, L.L.C. (which owns 100% of the equity interests in Rooster Petroleum and Rooster Oil) and that the DIP Lender intends to bid to purchase these assets.

92.     I have reviewed the terms of the proposed order attached as Exhibit 1 to the DIP Financing Motion (the "DIP Order") and the credit agreement attached as Exhibit 2 to the DIP Financing Motion (the "DIP Credit Agreement").  I believe that the terms of the DIP Loan, as reflected in DIP Order and the DIP Credit Agreement, are fair and equitable to the Debtors and their estates.  Furthermore, the DIP Loan is necessary because the Debtors have not succeeded in obtaining the consent of the Prepetition Agent to use cash collateral and thus, as of the Petition Date, have no mechanism for funding the Debtors' chapter 11 expenses.

93.     If the Debtors are unable to obtain the DIP Loan, they will be unable to fund the chapter 11 administration expenses and reorganize, and thus the value of their estates and of their collateral will be adversely affected. By obtaining the DIP Loan, the Debtors will be able to fund the necessary costs and expenses to reorganize which will increase the value of their estates and of their collateral and maximize payments to creditors.

**D.     Prepetition Wage and Benefits Motion and Insider Compensation Motion**

94.     In the Prepetition Wage and Benefits Motion, the Debtors seek entry of an order authorizing them, in their discretion, to pay, continue, or otherwise honor various prepetition labor-related obligations (collectively, the "Prepetition Workforce Obligations") to or for the benefit of their current, full-time, part-time, permanent, and temporary Employees ("Employees") for compensation, benefits, and expense reimbursements under all

4847-5923-1295 v9

2909093-000015 06/02/2017

plans, programs, and policies maintained or contributed to, and agreements entered into, by the Debtors prior to the Petition Date (as described below, the "Workforce Programs"). In addition, the Debtors request that the Court confirm their right to continue each of the Workforce Programs in the ordinary course of business during the pendency of these Chapter 11 Cases in the manner and to the extent that such Workforce Programs were in effect immediately prior to the filing of such cases and to make payments in connection with expenses incurred in the post-petition administration of any Workforce Program.

95. The Workforce Programs under which the Prepetition Workforce Obligations arise are described more fully in the Prepetition Wage and Benefits Motion and include, without limitation, plans, programs, policies, and agreements providing for (a) wages, salaries, bonuses, earned time off, and other accrued compensation; (b) reimbursement of business, travel, relocation, and other reimbursable expenses; and (c) benefits, with coverage as applicable for current employees, and their spouses and dependents, in the form of medical, dental, and vision coverage, pre-tax contribution flexible-spending accounts, basic term life, supplemental life, accidental death and dismemberment, long-term disability, savings, retirement, pension and related types of benefits, and miscellaneous other benefits provided to the Workforce in the ordinary course of business.

96. The Debtors also request authorization to pay any and all local, state, and federal withholding and payroll-related or similar taxes relating to the Prepetition Workforce Obligations, including, but not limited to, all withholding taxes, social security taxes, unemployment taxes and Medicare taxes. In addition, the Debtors request authorization to pay to third parties, on behalf of the Employees, any and all amounts deducted from the Employees paychecks for garnishments, charitable contributions, support payments, savings

39

programs, benefit plans, insurance programs, and other similar programs.

97. Lastly, in support of the Wage and Benefits Motion, the Debtors request that the Court authorize and direct all banks and financial institutions to receive, process, honor, pay, and, if necessary, reissue all prepetition and post-petition checks and fund transfers, including prepetition checks and electronic payment and transfer requests that the Debtors reissue or re- request post-petition, drawn on the bank accounts used by the Debtors to satisfy their obligations in connection with Prepetition Workforce Obligations, upon receipt by each bank or financial institution of notice of such authorization, provided that sufficient funds are on deposit in the applicable accounts to cover such payments. The Debtors additionally request that the Court authorize them to issue new post-petition checks to replace any checks that may nevertheless be dishonored and to reimburse any expenses that holders of claims in connection with Prepetition Workforce Obligations may incur as a result of any bank's failure to honor a prepetition check.

98. As of the Petition Date, the Debtors' Workforce consisted of approximately 80 current Employees. Of the Employees, 4 are salaried with Rooster Petroleum, 12 are salaried with Well Services, and 64 are hourly Employees with Well Services. The hourly employees are paid in arrears weekly on each Friday. The salaried employees are paid current bi-monthly in arrears on the 1st and the 15th. Rooster pays its employees by direct deposit from the designated payroll accounts at the Debtors' depository bank, Amegy which are described in more detail above.

99. The Workforce performs a variety of critical functions, including the development and production of oil and gas, sales, purchasing, repair and maintenance, information and technology, as well as a variety of administrative, accounting, legal, finance,

4847-5923-1295 v9

2909093-000015 06/02/2017

marketing, management, supervisory, human resources, and other related tasks, including tasks in connection with the maintenance of transactions and records affecting the Debtors' oil and gas interests as well as the health, safety, environmental, and regulatory aspects of the Debtors' operations. Morrison Well Services' hourly employees perform the services for decommissioning projects.

100. I believe that the Debtors' ability to preserve their businesses, safely and productively operate their businesses, and successfully reorganize their capital structure is dependent on the expertise and continued enthusiasm and service of their Workforce. Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, I believe that the continuity and competence of the Debtors' Workforce would be jeopardized if the relief requested in the Workforce Obligations Motion is not granted.

101. It is my belief that if the Debtors fail to pay the Prepetition Workforce Obligations in the ordinary course of business, the Employees will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses. This would have a highly negative impact on Workforce morale and productivity, thereby resulting in immediate and irreparable harm to the Debtors' continuing operations and their estates. Accordingly, I believe that continuation of the Workforce Programs is vital to preventing the loss of key members of the Workforce during the pendency of these Chapter 11 Cases and to maintaining the continuity and stability of the Debtors' operations.

a. <u>Prepetition Workforce Compensation</u>

102. ***Employee Payroll and Payroll Deductions***. It is my understanding that in the ordinary course of their businesses, the Debtors make deductions from Employees' paychecks for payments to third parties on behalf of Employees for various federal, state, and local

41

income, employment taxes (FICA, FUTA, SUTA and Medicare) and other taxes, as well as for charitable contributions, garnishments, support payments, savings programs, benefit plans, insurance programs, and other similar programs (collectively, the "Deductions").

103.    I have also been informed that certain of the Employees are owed certain prepetition amounts. Where Employees are owed prepetition compensation amounts, the applicable Deductions have not yet been taken. Additionally, the Debtors may not yet have forwarded to the various third parties noted above the payments that are attributable to the Deductions that have been withheld from Employees' paychecks.

104.    I have been informed that, as of the Petition Date, Well Services owed hourly employees an aggregate of approximately $141,000.00 in prepetition wages (or approximately $2,203 per hourly employee) for the period of May 29 through June 2, 2017, and salaried Employees, excluding the officers for whom a separate motion is being filed, an aggregate of $4,634.00 in prepetition accrued salary (or approximately $421.00 per salaried employee) for the period June 1 through June 2, 2017.   As of the Petition date, Rooster owed salaried Employees, excluding the officers for whom a separate motion is being filed, an aggregate of $486.00 (or approximately $243.00 per Employee) in prepetition accrued salary for the period June 1 through June 2, 2017.  These amounts include Deductions.

105.    ***Vacation and Sick Days***. As part of their  overall compensation, salaried Employees are entitled to receive a certain number of vacation and sick days each year (collectively, "Earned Time Off"). Salaried Employees receive 4 weeks of Earned Time Off per year.

106.    Vacation pay for each salaried Employee is earned and vested on January 1 of each year; however, if an Employee resigns or is terminated for cause during such year, such

4847-5923-1295 v9

2909093-000015 06/02/2017

Employee is entitled to receive a cash payment for his or her vacation pay prorated from January 1 of such year through the date of termination and forfeits his or her right to any remaining vacation pay. If an Employee is terminated without cause during such year, such Employee is entitled to a cash payment for his or her vacation pay earned and vested on January 1 of that year. I have been informed that, as of the Petition Date, Well Services owed $82,127 (or approximately $2,933.10 per Employee), and Rooster Petroleum owed $6,981.00 (or approximately $3,490.00 per Employee), in accrued vacation pay as of the Petition Date. This accrued amount, however, does not represent a true "cash" liability for the Debtors, as I anticipate that Employees will use most of their Earned Time Off in the ordinary course of business.

107. ***Compensation of Specified Officers.*** For purposes of the Insider Compensation Motion, have been informed that, as of the Petition Date, the pre-petition salaries of the Specified Officers defined therein, the amount accrued pre-petition for the period June 1 through June 2, 2017, and their accrued vacation time, were:

| | |
|---|---|
| Kenneth F. Tamplain, Jr. | $400,000 ($16,666.67 bi-monthly)<br>$2,222.22 accrued pre-petition salary<br>$29,230.77 accrued vacation time |
| Todd Darcey | $300,000 ($12,500 bi-monthly)<br>$1,666.67 accrued pre-petition salary<br>$8,076.92 accrued vacation time |
| Brett P. Blanchard: | $340,000 salary ($14,166.67 bi-monthly);<br>$1,888.89 accrued pre-petition salary<br>$15,692.31 accrued vacation time |

108. Again, this accrued amount, however, does not represent a true "cash" liability for the Debtors, as I anticipate that Employees will use most of their Earned Time Off in the ordinary course of business.

43

109.     While I and the other Specified Officers have assisted in the preparations for filing the Debtors' bankruptcy proceedings, neither I, nor to my knowledge any of the other Specified Officers, received any additional compensation, above and beyond our regular salaries, for services rendered in connection with the Debtors' bankruptcy cases.

b.     Employee Benefits

110.     Prior to the Petition Date, the Employing Debtors made contributions to a Section 401(k) savings plan and provided certain benefits through third party providers the "Employee Benefit Contributions").  Specifically, the Employee Benefit Contributions include the following:

a.   Contributions for primary health insurance coverage, through Blue Cross and Blue Shield of Louisiana, and dental coverage, through AlwaysCare, on all Employees and their dependents (if enrolled), including coverage for major medical, dental, vision and prescription drug expenses through a health maintenance organization and a preferred provider organization. (A portion of the premium is paid by the Employees through payroll deductions.)

b.   Contributions for group life insurance and personal accident insurance coverage in which all of the Employing Debtors' respective employees are enrolled. The Employing Debtors pay 100% of the cost of such insurance. Supplemental life insurance and personal accident insurance may be purchased by the Employee. Any premium for supplemental coverage is made through payroll deduction and transferred to the insurance provider shortly after withholding.

c.   Contributions by the Employing Debtors for short-term and long-term disability benefits in which their respective Employees are enrolled. The Employing Debtors pay 100% of the cost of such benefits.

d.   Well Services maintains a 401(k) Plan (the "Plan") that meets the requirements of section 401(k) of the Internal Revenue Code of 1986, as amended, 26 U.S.C. § 401(k).  Employees can elect to make before-tax contributions to the Plan through payroll deductions which are then paid to Yova Financial, Inc. the investment manager thereof, shortly thereafter. The Debtors do not match employee contributions, or otherwise contribute to the Plan, but do collect and remit contributions made by Employees.  29 Employees actively participate in the Plan.

44

> e. Contributions for workers' compensation insurance provided by the Employing Debtors. The Debtors believe that coverage under this policy is in compliance with the statutory minimum requirements.

111.     As described above, certain of the Employee Benefits remained unpaid or were not provided as of the Petition Date as certain obligations of the Debtors under the applicable plan, program, or policy accrued, either in whole or in part, prior to the commencement of these Chapter 11 Cases—but will not be required to be paid or provided in the ordinary course of the Debtors' business until a later date. In the Workforce Obligations Motion, the Debtors request authority to pay or provide, as they become due, all prepetition Employee Benefits that have already accrued and that are described above. I have been informed that the Debtors are current on these obligations.

112.     In the Workforce Obligations Motion, the Debtors also request confirmation of their right to continue to perform their obligations with respect to all of the Workforce Programs, except as otherwise indicated in the Workforce Obligations Motion. I believe that the Workforce Programs are essential to the Debtors' efforts to maintain Workforce morale, reward performance through certain incentives, minimize attrition, and preserve the continuity and stability of the Debtors' operations. I also believe that the expenses associated with the Workforce Programs are reasonable and cost-efficient in light of the potential attrition, loss of morale, loss of productivity, and disruption of business operations that would occur if the Workforce Programs were discontinued.

113.     Notwithstanding the foregoing, the Debtors reserve the right to evaluate all Workforce Programs and to make such modifications, including terminating any particular plan, program, or policy, as may be necessary or appropriate during the pendency of these Chapter 11 Cases.

4847-5923-1295 v9

2909093-000015 06/02/2017

c.     Honoring of Prepetition Checks

114.     I understand that, prior to the Petition Date, the Debtors paid certain of their

Prepetition Workforce Obligations with checks that had not been presented for payment as of

the Petition Date. To ensure the orderly payment of the Prepetition Workforce Obligations, the

Debtors request that the Court enter an order requiring the Debtors' banks to honor any such

checks which are drawn on the Debtors' accounts, and authorizing the banks to rely on the

representations of the Debtors as to which checks are subject to the Workforce Obligations

Motion. To the extent that any such checks are nevertheless refused payment, I believe it is

important to Workforce morale that the Debtors receive the requested authority to issue

replacement checks and to reimburse their Workforce for any loss resulting from the

dishonoring of any checks issued prior to the Petition Date.

**D.     Tax and Insurance Motion**

*a.     Taxes*

115.     In the Tax and Insurance Motion, the Debtors seek entry of an order

authorizing but not  requiring them to pay, any prepetition tax and fee obligations including,

without limitation, sales, use, and excise taxes; income or gross receipts taxes; franchise taxes;

net worth; real and personal property taxes; or other business, occupation, withholding, or

regulatory taxes or fees; any other types of taxes, fees or charges; and any penalty, interest, or

similar charges (collectively, the "Taxes and Fees")[7] owing to the federal, state, and local

governmental entities with jurisdiction over the Debtors (the "Governmental Units").

116.     It is my understanding that payment of the Taxes and Fees pursuant to the Tax

---

[7] I understand that the Debtors incur various taxes related to their employees and are separately required to withhold certain amounts from each employee's paycheck on account of things such as social security and FICA. I understand that such payroll, withholding, and other employee-related tax obligations are separately addressed in the Workforce Obligations Motion.

46

4847-5923-1295 v9

2909093-000015 06/02/2017

Motion would be discretionary, allowing the Debtors, among other things, to pay the Taxes and Fees that would subject their officers and directors to personal liability in the event of nonpayment prior to any other Taxes and Fees. Likewise, I understand that the Tax Motion would extend to the payment of Taxes and Fees relating to tax audits that have been completed, are in progress, or arise from prepetition periods. In addition, I believe that authorization sought pursuant to the Tax Motion would be without prejudice to the Debtors' rights to contest the amounts of the Taxes and Fees on any grounds.

117.    By paying the Taxes and Fees in the ordinary course of business, as and when due, I believe the Debtors will avoid unnecessary disputes with the Governmental Units - and expenditures of time and money resulting from such disputes - over myriad issues that are typically raised by such units as they attempt to enforce their rights to collect Taxes and Fees.

118.    I understand that, prior to the Petition Date, the Debtors incurred obligations to federal, state, and local governments. Although, as of the Petition Date, I have been informed that the Debtors were substantially current in the payment of assessed and undisputed Taxes and Fees, certain Taxes and Fees attributable to the prepetition period were not yet due. Certain prepetition Taxes and Fees will not be due until the applicable monthly, quarterly, or annual payment dates -- in some cases immediately and in others not until next year.

119.    I believe that the continued payment of the Taxes and Fees on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby promoting their prospects for a successful chapter 11 process. If such obligations are not timely paid, I believe that the Debtors will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Governmental Unit's applicable laws, including whether (a) the obligations are

47

4847-5923-1295 v9

2909093-000015 06/02/2017

priority, secured or unsecured in nature, (b) they are proratable or fully prepetition or post-petition, and (c) penalties, interest, attorneys' fees and costs can continue to accrue on a post-petition basis, and, if so, whether such penalties, interest, attorneys' fees, and costs are priority, secured, or unsecured in nature.

120.     Moreover, I believe that nonpayment or delayed payment of the Taxes and Fees may also subject the Debtors to efforts by certain Governmental Units, whether or not permissible under the Bankruptcy Code, to revoke the Debtors' licenses and other privileges either on a post-petition or post-confirmation basis. Moreover, certain of the Taxes and Fees may be considered to be obligations as to which the Debtors' officers and directors may be held directly or personally liable in the event of nonpayment. In such events, I believe that collection efforts by the Governmental Units would create obvious distractions for the Debtors and their officers and directors in their efforts to bring the Chapter 11 Cases to an expeditious conclusion.

121.     Lastly, I understand that certain of the Governmental Units have not been paid or have been sent checks or fund transfers for the Taxes and Fees that may or may not have been presented or cleared as of the Petition Date. Similarly, in other cases, the Taxes and Fees have accrued or are accruing, or are subject to audit or review, but have not yet become due and payable and, thus, any checks or fund transfers will be issued on a post-petition basis. Accordingly, in the Tax Motion, the Debtors seek entry of an order authorizing and directing their banks and other financial institutions to receive, process, honor, and pay all prepetition and post-petition checks and fund transfers issued by the Debtors to the Governmental Units in payment of Taxes and Fees that had not been honored and paid as of the Petition Date. Further, in the Tax Motion, the Debtors seek entry of an order authorizing the Debtors' banks

48

and financial institutions to rely on the representations of the Debtors as to which checks and fund transfers should be honored and paid in respect of the Taxes and Fees, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

b. *Insurance*

122. In connection with the normal operation of their businesses, Well Services entered into an insurance premium financing agreement with the lender described below, pursuant to which the lender loaned certain funds to pay insurance premiums in exchange for a security interest in the unearned premiums from applicable policies. In the Tax and Insurance Motion, the Debtors request authority to continue making the payments under this premium finance agreement.

123. Specifically, Well Services entered into a Premium Finance Agreement dated April 1, 2017, in the amount of $643,047.35 with Premium Assignment Corporation (the "MWS Premium Finance Loan"). Under the agreement, this loan is secured by the unpaid premiums under the following insurance policies:

- Lloyd's of London Policy No. EALMW000117A (general & umbrella/excess liability);

- Lloyd's of London Policy No. NO5MM-41-1113-05 (worker's compensation); and

- Lloyd's of London Policy No. MMORR000116 (property).

124. Nine payments of $58,171.08 each are due beginning on May 1, 2017 and continuing on the same day of each of the following eight months, for the MWS Premium Finance Loan. If the Debtors fail to make these monthly payments, I am informed and believe that Premium Assignment Corporation may be able to obtain relief from the automatic stay to cancel Well Services' insurance policies in order to assert its security interest in the unearned

4847-5923-1295 v9

2909093-000015 06/02/2017

premiums, with the result that Well Services' insurance would be cancelled.

**E. Utilities Motion**

125.    In the Utilities Motion, the Debtors request entry of interim and final orders, approving procedures that would provide adequate assurance of payment to their utility service providers (the "Utility Companies") under Bankruptcy Code Section 366, while allowing the Debtors to avoid the threat of imminent termination of electricity, water, natural gas, waste removal, telephone, internet, alarm, telecommunication and similar utility products and services (collectively, the "Utility Services") from the Utility Companies.  Specifically, the Debtors request entry of interim and final orders (a) prohibiting the Utility Companies from altering, refusing, or discontinuing services to, or discriminating against the Debtors on account of pre-petition amounts due, pending entry of the Final Order (b) determining that the Utility Companies have received adequate assurance of payment for future utility services, pending entry of the Final Order; and (c) establishing certain procedures for determining requests for additional assurance.

126.    I have been informed that, as of the Petition Date, approximately eight Utility Companies provide Utility Services to the Debtors at its headquarters, its platforms, and certain support locations.  I am not currently aware of any past due amounts owed to any of the Utility Companies.  Certain of the Utility Companies retain already retain a security deposit in connection with their services for the Debtors.  Based on the timing of the filings in relation to the Utility Companies' billing cycles, however, there may be utility costs that have been invoiced to the Debtors for which payment is not yet due and utility costs for services provided since the end of the last billing cycle that have not yet been invoiced to the Debtors. Exhibit 1 to the Utilities Motion is a true and accurate reflection of the extent of the Utility

4847-5923-1295 v9

2909093-000015 06/02/2017

Services as of the Petition Date.

127.     I believe that the Utility Services are crucial to the Debtors' operations. If the Utility Companies refuse or discontinue service, even for a brief period, I believe the Debtors' business operations would be severely disrupted.

128.     I understand that the Debtors intend to pay all post-petition obligations owed to the Utility Companies in a timely manner. Nevertheless, to provide additional assurance of payment for future services to the Utility Companies, the Debtors will allow Utility Companies to retain Prepetition security deposits as adequate assurance of future performance, subject to the Utility Companies' ability to request additional adequate assurances under the procedures set forth in the Utilities Motion.

### F.     Royalty Motion

129.     In the Royalty Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to pay in the ordinary course of business, whether such obligations were incurred prepetition or will be incurred post-petition, (i) Royalty Payments, (ii) Working Interest Disbursements, and (iii) Lease Obligations, and (b) granting related relief.

130.     As noted above, some of the Debtors are oil and natural gas companies engaged in the acquisition, exploration, exploitation, development, and operation of onshore and offshore oil and gas properties, In the ordinary course of their business, the Debtors operate certain wells for the production and sale of oil and natural gas on their own behalf and on behalf of certain Royalty Interest Owners, Working Interest Owners, and other parties pursuant to Oil and Gas Leases and/or Joint Operating Agreements (each as defined in the Debtors' Royalty Motion).

131.     ***Royalties.***     Rooster Oil and Cochon (as the lease owners) are obligated,

51

4847-5923-1295 v9

2909093-000015 06/02/2017

pursuant to the terms of the applicable oil and gas leases and other agreements, to make certain royalty payments to ONRR under such leases for its share of production from the Debtors' producing wells (collectively, "Royalties").  In addition, the Debtors must pay royalties to the holders of those overriding royalty interests ("ORRIs" together with Royalties, collectively, the "Royalty Payments"; ONRR and the holders of ORRIs are referred to herein as "Royalty Interest Owners"). I am informed and believe that Royalty Payments are governed by contract  frameworks that set strict payment deadlines and contain enforcement mechanisms.

132.    For Royalties, payments are typically made monthly, one month in arrears (with a reconciliation in the second month) after disposition of the produced hydrocarbons. Payments are typically made two months in arrears for ORRIs.  Although the monthly amount of the Royalty Payments vary based on actual production, based on a 12-month average of $200,000 per month, I would reasonably estimate that, as of the Petition Date, the Debtors owe approximately $200,000.00 in unpaid prepetition Royalties due to ONRR. Further, based on the 12-month averages for ORRIs, I would reasonably estimate that, as of the Petition Date, the Debtors owe approximately $164,000 in unpaid prepetition ORRIs. Failure to pay Royalty Payments could result in actions seeking the forfeiture, cancellation, or termination of the oil and gas leases under the terms thereof.

133.    ***Working Interests.***  Rooster Petroleum and/or Cochon (as the operator for their respective leases) are also obligated under drilling agreements and/or joint operating agreements and other similar agreements (collectively "Joint Operating Agreements") to market and sell oil and gas produced from the Debtors' wells, and to make payments to Rooster Oil and other working interest owners on account of such production (collectively

52

"Working Interest Disbursements").  Additionally, for the Operated Leases, Rooster Petroleum and Cochon must timely pay operating expenses attributable to the producing wells to third parties that perform labor or furnish or transport materials, equipment, or supplies used in the drilling, operating, or maintaining of an oil and gas property (the "Operating Expense Payments"), and then seek reimbursement for each party's pro rata share of the Operating Expense Payments as provided in the Joint Operating Agreements (the "Joint Interest Billings").

134.    If the Debtors fail to timely pay Working Interest Disbursements, Operating Expense Payments, and Joint Interest Billings may result in the perfection of liens on the operator's interest in the applicable ease, as well as other consequences, including removal of the operator.

135.    As noted above, one or more of the Debtors hold working interests in each of the Oil and Gas Leases the Debtors own; furthermore, Rooster Petroleum and Cochon are  the designated Operator for such leases pursuant to Joint Operating Agreements covering both the Debtors' Working Interests and the Working Interests of third parties.  As the Debtors extract oil and gas, they sell their production to "first purchasers." For these Operated Leases, first purchasers typically remit payment to the Debtors for purchased oil on or before the 20th of the month following production and for purchased gas on or before the 25th of the month following production.

136.    Payments for Working Interest Disbursements are typically made monthly, two months in arrears after disposition of the produced hydrocarbons.  Although the monthly amount of the Debtors' Working Interest Disbursements varies based on actual production, based on a 12-month average of $20,000 per month, I would reasonably estimate that, as of

4847-5923-1295 v9

2909093-000015 06/02/2017

the Petition Date, approximately $40,000.00 in unpaid prepetition Working Interest Disbursements are or will be owed to working interest owners. Due to the timing of invoicing expenses, Joint Interest Billings due from these working interest owners to the Debtors are paid separately by such owners, and thus typically are not set off from the Working Interest Disbursements.

137. For the Non-Operated Leases, again, while the amounts vary based on actual production, based on a 12-month average of $66,000 per month, I would reasonably estimate approximately $132,000.00 in unpaid prepetition Joint Interest Billings that are or will be owed to the operators for the Non-Operated Leases.

138. ***Additional Lease Obligations.*** In addition to the foregoing payments, the Debtors may also be required to make certain non-royalty lease payments to ONRR in addition to Royalty Payments under the applicable leases, including, but not limited to, delay rental payments (to perpetuate a lease that remains undeveloped), lease extension payments (to extend the primary term of a lease that remains undeveloped), shut-in royalty payments (a substitute for Royalty Payments where a well has been drilled and is capable of production, but is not producing), and minimum royalty payments (again, if the lease requires) ("Non-Royalty Lease Payments"). As with the failure to make Royalty Payments, the failure to make delay rental payments, lease extension payments, shut-in royalty payments, and minimum royalty payments can also result in actions seeking the forfeiture, cancellation, or termination of the leases under the terms thereof.

139. For the Operated Leases, Rooster Petroleum and Cochon are usually obligated to pay the Non-Royalty Lease Payments on behalf of Rooster Oil and the non-operating working interest owners pursuant to the terms of the applicable leases and Joint Operating

4847-5923-1295 v9

2909093-000015 06/02/2017

Agreements, respectively. As of the Petition Date, I have been informed and believe that the Debtors do not owe any prepetition Non-Royalty Lease Payments.

### G. Hedging Motion

140. In the Hedging Motion, the Debtors seek interim and final orders authorizing, but not directing, the Debtors, in the ordinary course of their businesses, (i) to pay prepetition amounts due, and (ii) to perform post-petition obligations under the prepetition Hedging Agreement.

141. To limit exposure to fluctuations in market prices with respect to their oil, natural gas, and natural gas liquids production activities, the Debtors, like many other, oil and gas exploration and production businesses, have historically hedged a portion of their oil, natural gas, and/or natural gas liquids production through the use of financial derivative transactions. These transactions include cash-settled swaps, with creditworthy financial counterparties, and the use of physically settled forward contracts under which the Debtors agree to physically deliver natural gas or crude oil at a fixed delivery point over a fixed period of time for a fixed price, each as specified in the applicable confirmation.

142. The Debtors' prepetition Hedging Agreement with BP is an over-the-counter commodity hedging transaction designed to provide a fixed price for gas produced at the Debtors' wells. Rooster Petroleum is the floating price payer under the Hedging Agreement, and BP is the fixed price payer at $3.0125 per one million British Thermal Units (MMBTU) per day, based on a notional quantity per calculation period that varies under the terms of the Hedging Agreement. The term of the current transaction under the Hedging Agreement expires in August 2018.

143. The Debtors have not decided whether to assume or reject the Hedging

4847-5923-1295 v9

2909093-000015 06/02/2017

Agreement and therefore is requesting authority in the Hedging Motion to continue performing under the Hedging Agreement, including paying amounts attributable to the time period before the Petition Date, pending a decision by the Debtors to assume or reject. Allowing the Debtors to continue performing under the Hedging Agreement will prevent BP from terminating the contract in the interim; at the same time, I have been informed that the Debtors' could owe a significant administrative claim for termination fees if the Debtors assumed the Hedging Agreement now and later decided to reject it. Furthermore, based on my experience, I do not believe that the Debtors can obtain better pricing for other hedges than the pricing under the Hedging Agreement. As a result, I believe that allowing the Debtors to perform the Hedging Agreement post-petition, without assuming or rejecting it, provides the Debtors with the most flexibility at this early stage in the Cases.

144.     BP has given notice that the Debtors will owe $24,795.09 under the Hedging Agreement on June 5, 2017. This amount will likely increase to approximately $37,000 for July 2017 and $40,000 for August 2017 based on a trend of increasing prices; however, as I noted above, oil and gas prices are volatile and these estimates may be significantly higher or lower depending on future price changes.

## CONCLUSION

145.     The Debtors' ultimate goal in these Chapter 11 Cases is to restructure their capital structure and maximize value for all stakeholders. In the near term, however, to minimize any loss of value of their businesses during these Chapter 11 Cases, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the early stages of these Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible. I believe that if the Court grants the relief requested in each of the First Day

4847-5923-1295 v9

2909093-000015 06/02/2017

Motions, the prospect for achieving these objectives and completing a successful reorganization of the Debtors' businesses will be substantially enhanced.

146.    I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is just and proper.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 2nd day of June 2017.

ROOSTER ENERGY LTD.

Kenneth F. Tamplain, Jr.
Chief Executive Officer and President

4847-5923-1295 v9

2909093-000015 06/02/2017